Andrew John WALKER,
Plaintiff–Appellant,

v.

George W. SUMNER,
Defendant–Appellee.

No. 88–15644.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 13, 1989 *.

Decided Oct. 22, 1990.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Andrew John Walker, Marion, Ill., in pro per.

J. Marty Howard, Nevada Atty. General's Office, Carson City, Nev., for defendant-appellee.

Before REINHARDT, BEEZER and KOZINSKI, Circuit Judges.

REINHARDT, Circuit Judge:

Andrew Walker, a former inmate of Nevada State Prison, brought an action against the director of the Nevada Department of Prisons and various prison officers and administrators under 42 U.S.C. § 1983 (1982) alleging that his fourth, eighth, and fourteenth amendment rights were violated. He contends the violation occurred when prison guards forced him to submit to a blood test—purportedly in connection with an AIDS testing program being administered in the state prisons—by threatening to shoot him with "taser" guns.[1] The district court, adopting the Report and Recommendation of a magistrate, granted defendants' motion for summary judgment and Walker appealed. A review of the record reveals that defendants offered no evidence that the AIDS test, if such was the purpose of the blood sampling, was "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987). Moreover, the record reveals that a material issue of fact exists regarding the prison officials' purpose in drawing Walker's blood. Accordingly, summary judgment in favor of the prison officials was inappropriate. We reverse.

---

1. A taser gun "operates by firing a tiny dart, attached to the gun with wires, into the prisoner, and by administering a low amperage, high voltage electrical shock which temporarily incapacitates the prisoner." *Michenfelder v. Sumner*, 860 F.2d 328, 330 (9th Cir.1988).

## I. FACTS

Pursuant to a Department of Prisons directive to obtain blood samples from all inmates, a prison nurse and security personnel approached Walker's cell with the intent of extracting blood from him. When the nurse asked Walker to put his arm through the food slot in his cell door so that she could draw his blood, he refused. She therefore directed that he be "red-tagged;" as a result, Walker was not allowed to shower or engage in recreational activities.

The following day, a security squad and two nurses returned to Walker's cell. When asked to put out his arm, he again refused, stating that he did not want to give blood. Sergeant P.C. Johnstone, a defendant in this case, told Walker that the warden had authorized him to use force if necessary to obtain the blood sample. Johnstone then told the nurses to leave, and he and the other security guards present drew their clubs and at least one turned on his taser gun. Walker tried to render any use of the taser gun ineffective by blocking part of his cell. However, Johnstone was ultimately able to aim his gun at Walker; he then ordered him to submit to the blood test, and Walker ended his physical resistance. The nurses then returned, and one of them reached through the cell door, took Walker's arm, and drew his blood. Walker alleges that the nurse was in "civilian" rather than "medical" clothing and that the needle she used was carried in an open cardboard box.

Walker admits that prior to the forced withdrawal of his blood he saw a memorandum addressed to prison staff explaining that blood tests would be conducted, but he asserts, correctly, that the memorandum did not state either that the tests were mandatory or that their purpose was to screen for AIDS. The prison officials, on the other hand, contend that the blood tests were in fact administered in order to determine if any prisoners were carriers of the AIDS virus; they also allege that they delivered a letter to Walker explaining that such was the reason for the tests and that the tests were mandatory. Walker asserts that he never received any such letter.[2] He also asserts that the blood samples were collected in order to help train medical personnel in the administering of tests for the AIDS virus. He alleges that each inmate was screened for AIDS upon entering the prison, and that the prison officials knew that no prisoners had AIDS at the time the disputed samples were taken. Defendants do not contest the latter two allegations.

Walker brought this section 1983 action *in propria persona*. Alleging violations of his fourth, eighth, and fourteenth amendment rights, he sought money damages for the involuntary withdrawal of his blood. Defendants moved for summary judgment. Walker did not respond within the allotted time, but rather filed a motion to compel the prison officials to comply with the discovery requests he had served on them several months earlier. He also asked the court to "vacate" the motion for summary judgment on the ground that defendants had not produced requested documents or answered written interrogatories. The magistrate denied the discovery requests, in part because Walker did not state that the material was necessary to oppose the motion for summary judgment. The magistrate did, however, permit Walker to file an opposition to defendants' motion.

The magistrate recommended that the motion for summary judgment be granted. She concluded that the prison officials had a paramount interest in identifying carriers of the AIDS virus, and that an AIDS test is reasonably related to that legitimate penological objective. The magistrate also determined that the degree of force used by the prison guards was reasonable. Thus,

---

**2.** Walker sought discovery to prove that neither he nor any other inmate was so informed, but the magistrate denied his request. The memorandum to the staff which Walker admits seeing not only does not mention AIDS but states that prisoners who refused to submit to the blood tests would be held in medical isolation until the tests were completed. There was no suggestion in the memorandum that a prisoner who declined to consent to the test would be forced to give blood involuntarily.

she found no violation of Walker's constitutional rights. The district court adopted the magistrate's Report and Recommendation without modification, and granted summary judgment to the defendants.

## II. DISCUSSION

Walker asserts that the involuntary withdrawal of his blood following the threatened use of taser guns constituted an unreasonable search and seizure under the fourth amendment as well as a violation of his eighth amendment rights. For several reasons, we conclude that the district court erred in granting summary judgment on the record before it.

 Prisoners, despite their conviction and confinement, do not forfeit all constitutional rights. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. at 84, 107 S.Ct. at 2259. Nevertheless, prisoners' constitutional rights are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Bell v. Wolfish*, 441 U.S. at 546–47, 99 S.Ct. at 1877–78. In *Turner v. Safley*, the Supreme Court set forth the standard for evaluating prisoners' constitutional claims. The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. at 2261. The Court identified four factors relevant in analyzing the reasonableness of a regulation: (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)); (2) the court should determine whether there are alternative means of exercising the constitutional right that remain open to the inmates;

(3) the court is to consider the impact that accommodation of the asserted constitutional right will have on guards, other inmates, and on the allocation of prison resources; and (4) the court should assess whether there are ready alternatives to the prison regulation—the absence of such ready alternatives suggests that the regulation is reasonable while their existence may be evidence of the opposite. *Turner v. Safley*, 482 U.S. at 90–91, 107 S.Ct. at 2262–63. The first of these factors constitutes a *sine qua non*. Because defendants failed to make the case necessary for summary judgment as to that factor, we need not consider the others; rather, we are required to reverse.

 The Supreme Court has repeatedly emphasized that, in determining the validity of regulations impinging on the constitutional rights of inmates, courts are to accord great deference to prison officials' assessments of their interests. *See, e.g., Turner v. Safley*, 482 U.S. at 84–85, 89, 107 S.Ct. at 2259–60, 2261–62; *Estate of Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404 ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977) ("Because the realities of running a penal institution are complex and difficult we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."). Nevertheless, deference does not mean abdication. Prison officials must "put forward" a legitimate governmental interest to justify their regulation, *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. at 2261–62, and must provide *evidence* that the interest proferred is the reason why the regulation was adopted or enforced. *Swift v. Lewis*, 901 F.2d 730, 732 (9th Cir.1990) ("prison officials must at least produce some evidence that their policies are based on legitimate penological

justifications"); *Caldwell v. Miller*, 790 F.2d 589, 598 (7th Cir.1986) ("the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation in question and its effect on the inmate's asserted rights"); *Wilson v. Schillinger*, 761 F.2d 921, 925 (3rd Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1494, 89 L.Ed.2d 895 (1986). The Constitution requires that "considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review." *Caldwell*, 790 F.2d at 599. It is only after prison officials have put forth such evidence that courts defer to the officials' judgment. *Id.* at 600.

■ We recently addressed the question of the proof necessary to sustain the government's burden. In *Swift v. Lewis*, inmates brought a section 1983 action against officers of the Arizona Department of Corrections, asserting that the prison's grooming policy, which prohibited long hair and beards, violated the Free Exercise Clause. The Department asserted several justifications for the policy, including quick inmate identification, preventing sanitary problems, minimizing contact between prisoners and guards during searches, and reducing homosexual attractiveness of inmates. *Swift*, 901 F.2d at 731. We acknowledged that courts have recognized all of these interests as legitimate penological objectives. Nevertheless, we reversed the district court's grant of summary judgment because the prison officials "failed to provide *any* evidence that the interests they have asserted are the actual bases for their grooming policy." *Id.* Without requiring some evidence that prison policies are based on legitimate penological justifications, we concluded, "judicial review of prison policies would not be meaningful." *Id.* at 732.

The Seventh Circuit's approach is similar. In *Caldwell v. Miller*, an inmate challenged, *inter alia*, a ban on group religious activities as part of a lockdown at Marion Penitentiary. *Caldwell*, 790 F.2d at 595. In support of his motion for summary judg-

ment, the warden, Miller, submitted an affidavit by a paralegal specialist at Marion reciting the events that precipitated the lockdown a few years earlier and noting that a task force convened to review the operation of the penitentiary recommended several changes to secure "a safer environment for both the inmate population and staff." *Id.* at 597. The Seventh Circuit reversed the lower court's order granting summary judgment to the warden, concluding

neither we nor the district court have any way of determining, based on the record, whether the continuing ban on group religious activities at Marion was reasonably adapted to achieving an important correctional goal. The interest in preserving order and authority in a prison is self-evident, and internal security is 'central to all other correctional goals.' Nonetheless, in the absence of evidentiary support, Miller's assertion that a total ban on all group religious services is and was reasonably necessitated by security considerations is conclusory, and hence, an insufficient basis for summary judgment.

*Id.* at 598–99 (quoting *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804–05, 41 L.Ed.2d 495 (1974)) (citations omitted).

Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point.

■ In the instant case, defendants have introduced absolutely no evidence to suggest that the mandatory AIDS test, if such was the purpose of the blood sampling, was based on a legitimate penological objective. Nor have they attempted to demonstrate the relationship between any such objective and the blood-testing policy. The only attempted justification for the policy adopted by the prison officials is the bare and unsupported assertion in their motion for

summary judgment and their brief on appeal that a mandatory AIDS test

> clearly has a logical connection to legitimate governmental interests. Such testing bears a logical connection to the health, safety and welfare of all of the inmates in the custody of the Nevada Department of Prisons and in [sic] the best interests of public health generally. AIDS testing is clearly a legitimate governmental interest and a valid penological objective.[3]

Such conclusory assertions are wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment. Presented with a record devoid of any relevant evidence, we cannot tell whether defendants' asserted justification—protecting the health, welfare and safety of the prison population—was the actual reason for conducting the mandatory blood tests. Nor can we determine—even if that was the prison officials' objective—whether the policy was reasonably related to the asserted objective. Defendants have offered no evidence, either in the form of deposition testimony or affidavits, to justify their policy or explain how it could help to achieve their goals. Not only is there a complete absence of evidence as to why the officials conducted the mandatory blood tests, but the record does not reveal what, if anything, the officials intended to do with the information obtained. We do not know for example whether the samples were being collected purely for statistical purposes, whether the prison officials intended to isolate AIDS carriers, whether they planned to provide some form of medical treatment for those who tested HIV positive, or even whether they would use the results for any purpose at all. Without a further explanation, general pro-

testations of concern for the welfare of the citizens of Nevada and the prison community are simply insufficient to render the involuntary seizure of blood specimens, even from prison inmates, constitutionally reasonable. Thus, on the record before us, we cannot endorse as constitutional the blood sampling at issue.

■ Moreover, even aside from the inadequacy of defendants' justification for the blood tests, we note that Walker has suggested that the tests were being conducted for a different purpose, a highly dubious one. Walker alleges that, near the time of the mandatory tests at issue, he heard an announcement on the radio that Nevada was instituting a voluntary AIDS testing program in order to help train state health care workers to administer tests for the AIDS virus. According to Walker, the radio announcement mentioned that blood samples would be taken at state prisons and other state institutions in order to help provide such training. He also notes that all inmates were screened for AIDS when they entered the prison, and that defendants admit that they knew that no prisoner had AIDS at the time he was ordered to submit to involuntary testing. Walker does not contend that prison authorities could not have had a legitimate interest in screening for AIDS, and in fact he claims that he willingly submitted to other AIDS tests that were conducted prior to the one at issue. He asserts, however, that obtaining blood to train state health care workers is not a legitimate penological objective—an assertion that may well be correct. "No matter how serious a disease, unwilling prisoners may not be made mere guinea pigs for its study. The state must show some penal interest." *Dunn v. White*, 880

---

**3.** Defendants also argue that not taking a blood sample from Walker, "would be to undermine the entire AIDS screening program at the Nevada State Prison. This would obviously impair the health, welfare and safety of all of the other inmates in the custody of the Nevada Department of Prisons and prison personnel." Again, however, there is no evidence that supports this assertion. In rejecting the warden's generalized contentions in *Caldwell*, the Seventh Circuit noted that "[t]he Supreme Court has repeatedly held that routine and automatic arguments to

the effect that 'every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security' are inadequate to support restrictive prison regulations or policies." *Caldwell*, 790 F.2d at 598 n. 14 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 207, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985)) (citations omitted). We agree with the Seventh Circuit's observatons and, as did the *Caldwell* Court, we find that defendants' argument "falls squarely within the Supreme Court's caveat." *Id.*

F.2d 1188, 1199 (10th Cir.1989) (McKay, J., dissenting), *cert. denied,* —— U.S. —— 110 S.Ct. 871, 107 L.Ed.2d 954 (1990).

To establish that the blood test was reasonably related to a legitimate governmental objective, the prison authorities were not required to produce an elaborate analysis of the risk of AIDS in prisons or the benefits of AIDS testing. They were required only (1) to establish what the purpose of the blood testing was, and (2) to show that the results were going to be used to further a legitimate penological end. They did neither. As the record stands there is no evidence relating to the reason for the blood test or what was done with the results. Summary judgment was therefore inappropriate.[4]

REVERSED AND REMANDED.

---

[4]. Because the record does not establish what government interests the blood test was designed to serve, we cannot say that any amount of force was reasonable. We therefore have no occasion to decide the constitutional questions arising out of the threatened use of a taser gun to take an inmate's blood. *See Mitchenfelder v.* *Sumner,* 860 F.2d 328, 336 (9th Cir.1988) (upholding the use of taser gun where plaintiff had failed to establish long-term health risks, but leaving open the question whether the use of tasers would be unconstitutional in the event that further research should "uncover evidence of adverse long-term effects").