47 F.3d 1176
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Jerome STANLEY, Plaintiff-Appellant,
v.
J.D. SWINSON, Warden; Flossie Jackson, (R.N.), Defendants-Appellees.
 No. 93-16078.
 United States Court of Appeals, Ninth Circuit.
 Submitted Dec. 15, 1994.*
Decided Feb. 6, 1995.
 
 Before: HUG, CANBY, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Appellant Stanley is a federal prisoner who brought a 42 U.S.C. Sec. 1983 action to enjoin prison authorities from forcing his participation in a study of Human Immunodeficiency Virus ("HIV") transmission in prisons. As part of the study, Stanley must undergo a blood test for HIV every six months. Stanley claims that the forced testing violates federal regulations against research on prisoners without their consent, as well as his Fourth and Fifth Amendment rights. Stanley appeals from the district court's denial of his request for a preliminary injunction against the testing.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1292(a)(1), and we affirm. Although we find that Stanley has raised a significant legal question as to whether his participation in an epidemiological study like the one at issue in this case must be voluntary, we affirm the district court's denial of a preliminary injunction because his injury is not irreparable, and the balance of hardships does not tip in his favor.
 
 DISCUSSION
 
 4
 "The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." Miller v. California Pac. Medical Ctr., 19 F.3d 449, 455 (9th Cir.1994) (en banc). "We review de novo issues of law underlying the district court's preliminary injunction." Id.
 
 
 5
 "A party seeking a preliminary injunction must fulfill one of two standards, described in this circuit as 'traditional' and 'alternative.' Under the traditional standard, a court may issue preliminary relief if it finds that (1) the moving party will suffer irreparable injury if relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. Under the alternative standard, the moving party may meet its burden by demonstrating either (1) a combination of probable success and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir.1987) (citations omitted).
 
 I. Governing Regulations
 
 6
 The Bureau of Prison's ("BOP") HIV-testing policy was originally set out in Operations Memorandum 180-89(6100), effective November 30, 1989 through September 30, 1990. The Operations Memorandum provided certain policy directives concerning the Human Immunodeficiency Virus. As part of that policy, the Operations Memorandum provided for testing of inmates for HIV. Three categories of inmates were specified.[1] The category at issue in this case involved testing of all inmates committed to prison from January 1, 1990 to February 16, 1990. The Operations Memorandum specified,
 
 
 7
 All inmates committed to the Bureau of Prisons between January 1 and January 31, 1990 will be tested. All inmates that test negative shall be retested at six months. The new commitment testing program as well as the follow-up testing program is mandatory. Failure to comply shall result in an incident report.
 
 
 8
 Although the Operations Memorandum specified prisoners committed from January 1 to January 31, 1990, this was later extended to February 16, 1990. Stanley was committed on February 1, 1990 and, thus, was in the group of inmates required to take the mandatory test and to be retested every six months. Stanley took the initial test and several succeeding six-month tests, but refused to take the test scheduled in the summer of 1992.
 
 
 9
 There were Justice Department regulations in effect at that time governing research on human subjects in 28 C.F.R. part 46 and more specific regulations governing research conducted in the prisons in 28 C.F.R. part 512. Stanley claims that the BOP's testing of the January 1 to February 16, 1990 sample of committed prisoners violates 28 C.F.R. Sec. 512.16, which requires informed consent for all research involving BOP prisoners. The Government responds that the random HIV testing is not "research" within the meaning section 512.16 because that section refers only to research conducted by outside persons or agencies. We conclude that, for the purpose of issuing a preliminary injunction, Stanley has raised a significant legal question as to whether the New Commitment Program is covered by the informed consent provisions of section 512.16.
 
 
 10
 The BOP amended part 512 after the briefs in this appeal were filed. But under either version, Stanley has a serious claim that part 512 covers research conducted by the BOP. Prior to its amendment, part 512 covered all research projects, defined as "the systematic collection of information about or from former or present inmates or employees, analysis of the information, and preparation of a report of findings." 28 C.F.R. Sec. 512.11(a) (1981-93). The HIV study seems to fall easily under this definition. BOP-sponsored projects were not exempted, and both employee and nonemployee researchers were covered.
 
 
 11
 The BOP amended part 512 on March 23, 1994. The amendment may be consistent with Stanley's position that part 512 covers BOP-sponsored research. Section 512.10 now states that it supplements 28 C.F.R. part 46--guidelines for the protection of human subjects involved in research conducted, supported, or regulated by the federal government. "Although some research may be exempt from 28 CFR part 46 ... no research is exempt from 28 CFR part 512." 28 C.F.R. Sec. 512.10 (1994).
 
 
 12
 The amendments are also consistent with Stanley's claim that the testing of newly committed prisoners should be considered "research" within the meaning of part 512. The 1994 amendment of part 512 deleted the definition of "research" from the original version. The interim rule refers to 28 C.F.R. Sec. 46.102 for definitions. 59 Fed.Reg. 13860 (Mar. 23, 1994). Section 46.102 defines "research" as follows:
 
 
 13
 Research means a systematic investigation, including research, development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Activities which meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program which is considered research for other purposes.
 
 
 14
 28 C.F.R. Sec. 46.102(d) (1994). Under this definition, it appears that the BOP is engaged in research involving human subjects. It is conducting an epidemiological study of HIV transmission in prison. The BOP's Operations Memorandum refers to "epidemiological studies." The random testing program is administered by the Office of Research. The BOP's response to one of Stanley's administrative complaints describes the HIV-testing program involving Stanley as "a study by the Bureau of Prisons to evaluate the rate of sero conversions within the Bureau of Prisons."
 
 
 15
 There are exceptions to part 512, both versions, but they do little to weaken Stanley's claim because on their face they do not seem to apply to the BOP's new commitment testing. The 1993 regulation states, "Routine statistical tabulations and program audits undertaken by employees for administrative purposes only are not defined as research projects." 28 C.F.R. Sec. 512.11(a) (1993). And the 1994 regulation states, "For the purpose of this rule, implementation of Bureau programmatic or operational initiatives made through pilot projects is not considered to be research." 28 C.F.R. Sec. 512.10 (1994).
 
 
 16
 The Operations Memorandum 180-89(6100) was eventually adopted in substance, though modified in some respects, as a regulation, 28 C.F.R. Sec. 549.10-549.20, and explained in Program Statement 6190.1. Section 549.10 describes the purpose and scope of those regulations as follows:
 
 
 17
 In conjunction with current medical procedures and treatments, the Bureau of Prisons provides programs of education, counseling, testing, and reporting for inmates to help restrict the spread of the Human Immunodeficiency Virus (HIV) and to maintain the quality of life for those who are HIV-positive.
 
 
 18
 Section 549.16(a) concerns tests of newly committed prisoners and states,
 
 
 19
 (a) New commitments and random sample.
 
 
 20
 (1) From time to time a random sample of all newly incarcerated inmates committed to the Bureau of Prisons shall be tested. An inmate who tests negative shall be retested at six month intervals. The newly incarcerated as well as the follow-up testing programs are mandatory. Failure to comply shall result in an incident report for failure to follow an order.
 
 
 21
 (2) Additionally, a random sample of all inmates in the Bureau of Prisons shall be conducted once yearly. Inmates tested in this random sample may not be scheduled for follow-up routine retesting. Participation in the random testing sample is mandatory. Any refusal shall be subject to an incident report for failure to follow an order.
 
 
 22
 The 1994 amendment to part 512 makes no reference to section 549.16. Thus, it appears that the only way to harmonize the otherwise conflicting regulations would be to consider 28 C.F.R. Sec. 549.16(a), which authorizes the mandatory testing of newly committed prisoners, a "routine statistical tabulation," "program audit," or "programmatic or operational initiative made through a pilot project," rather than "research" requiring informed consent under 28 C.F.R. Sec. 512.16.
 
 
 23
 The operation of 28 C.F.R. Secs. 512.16 and 549.16 thus raises three questions of law:
 
 
 24
 (1) Does the testing program instituted on newly committed prisoners on January 1, 1990 via Operations Memorandum 180-89(6100) violate 28 C.F.R. Sec. 512.16?
 
 
 25
 (2) If this testing is not in accord with 28 C.F.R. Sec. 512.16,
 
 
 26
 (a) does the adoption of 28 C.F.R. Sec. 549.16 provide for a specific program that is exempt from the requirements of 28 C.F.R. Sec. 512.16, and
 
 
 27
 (b) if so, does the adoption of that regulation on December 30, 1990 cure the prior violation of 28 C.F.R. Sec. 512.16 and authorize the subsequent testing of those inmates in the test group prior to December 30, 1990?
 
 
 28
 Given the unsavory history of using prisoners as involuntary human subjects for medical research, we hesitate to consider an epidemiological study involving a physically invasive, although admittedly minor, medical procedure as exempt from federal regulations on prisoner research. See, e.g., Clay v. Martin, 509 F.2d 109 (2d Cir.1975) (injection of Naltrexone, which caused heart attack, without explaining risk); Runnels v. Rosendale, 499 F.2d 733 (9th Cir.1974) (hemorrhoidectomy without consent); Mackey v. Procunier, 477 F.2d 877 (9th Cir.1973) (injection of "fright drug" succinylcholine without consent). It is important that regulations of research conducted in prisons be clear. We hold that Stanley has raised significant legal questions concerning the application of these regulations.
 
 II. Constitutional Question
 
 29
 Stanley also claims that the random testing violates his constitutional rights. He claims that it is an unreasonable search and seizure under the Fourth Amendment, and that it invades his privacy under the Fifth Amendment. The Government responds that the tests are reasonably related to legitimate penological objectives.
 
 
 30
 Blood tests may, in some instances, impinge on a prisoner's constitutional rights. See Thompson v. City of Los Angeles, 885 F.2d 1439, 1447 (9th Cir.1989) ("we openly acknowledge the serious intrusive nature of the extraction of blood from the person"). The question is whether, given the prison context, the Government has provided sufficient justification for the intrusion.
 
 
 31
 The Supreme Court in Turner v. Safley set the standard for evaluating a prisoner's constitutional claims. The standard is that " 'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' " Walker v. Sumner, 917 F.2d 382, 385 (9th Cir.1990) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). "The [Supreme] Court identified four factors relevant in analyzing the reasonableness of a regulation: (1) 'there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it'; (2) the court should determine whether there are alternative means of exercising the constitutional right that remain open to the inmates; (3) the court is to consider the impact that accommodation of the asserted constitutional right will have on guards, other inmates, and on the allocation of prison resources; and (4) the court should assess whether there are ready alternatives to the prison regulation--the absence of such ready alternatives suggests that the regulation is reasonable while their existence may be evidence of the opposite." Id.
 
 
 32
 We have held that forced blood tests (although not HIV tests) of prisoners for the purpose of diagnosing serious disease and preventing its transmission among the prison population do not violate the Fourth Amendment or the Due Process Clause. Thompson, 885 F.2d at 1447, 1448. As we held in Walker, to establish that the blood test was reasonably related to a legitimate governmental objective, the prison authorities "were required only (1) to establish what the purpose of the testing was, and (2) to show that the results were going to be used to further a legitimate penological end." Walker, 917 F.2d at 398. We thus conclude that Stanley has raised a significant constitutional question as to whether this research requiring mandatory HIV testing has a legitimate penological objective.
 
 
 33
 We note that the Government has produced only a conclusory record substantiating a penological objective. In Walker v. Sumner, we remanded a prisoner's challenge to mandatory HIV testing because the Government had not adequately shown the actual purpose of the blood tests. We held,
 
 
 34
 [p]rison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point.
 
 
 35
 Walker, 917 F.2d at 386. Only testing for research purposes is being challenged here. Stanley does not contest the testing for purposes of diagnosis, treatment, or release into the community. See Operations Memorandum 180-89(6100) (specifying categories of authorized HIV testing); 28 C.F.R. Sec. 549.16 (same). This being the case, the BOP has not identified the specific purpose of its sero conversion study, as opposed to the purposes of its other testing programs. The Operations Memorandum discusses the purpose of epidemiological studies generally, and then simply concludes that BOP studies serve "much the same function."
 
 
 36
 The specific purposes of the study are important because, even if they are considered legitimate penological objectives, the additional factors of the Turner test must still be considered. Of particular relevance is the fourth factor: "the court should assess whether there are ready alternatives to the prison regulation." Walker, 917 F.2d at 385. The briefs do not address whether the same goals can be achieved by gathering data from the voluntary, clinically-indicated, and pre-release test results.
 
 III. Irreparable Injury
 
 37
 Stanley meets one prong of the alternative standard--that serious questions are raised. He may even meet the prong of probable success on the merits, satisfying either the traditional or the alternative standard. We affirm the district court's denial of a preliminary injunction because Stanley fails to meet any of the hardship prongs.
 
 
 38
 Stanley has not shown how having a blood sample taken every six months will cause him irreparable injury. On the other hand, if an injunction is granted, the prison will be forced to interrupt its research on HIV transmission in prisons. As the Operations Memorandum states, "[t]he benefits derived from any study are dependent upon the accuracy of the test design, the data collection, and the compilation of the data. Uniformity in these areas is vital if the collected data is to be properly assessed." Considering the potential injury on both sides, the district court did not abuse its discretion in its finding that the plaintiff had not established that the balance of hardships tipped in his favor.
 
 CONCLUSION
 
 39
 On both the regulatory and the constitutional issues, Stanley has raised serious questions. But he has not shown irreparable injury; nor has he shown that the balance of hardships tips in his favor. We therefore affirm the district court's denial of a preliminary injunction.
 
 
 40
 Because of the importance of regulation of research in prisons and the strength of Stanley's claims, we recommend that, if possible, an attorney be appointed to represent Stanley in this matter. This would greatly assist the court in ruling on the merits. We also suggest that the Government develop a more complete record of its penological interest with respect to the New Commitments HIV-Testing Program.
 
 
 41
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The three categories specified were (1) a sample of newly committed prisoners, (2) prisoners who were at risk or requested testing, and (3) prisoners who were being considered for mandatory release, parole, furlough, or a community-based program. Only the first category is at issue in this case