**Steven Leonard THEUS, Plaintiff,**

v.

**Ron ANGELONE, et al., Defendants.**

Nos. CV–N–94–257–DWH,
CV–N–94–886–DWH.

United States District Court,
D. Nevada.

Aug. 8, 1995.

Steven Leonard Theus, in pro per.

Anne Cathcart, Deputy Atty. Gen., for defendants.

### ORDER

HAGEN, District Judge.

Plaintiffs Steven Leonard Theus ("Theus") and Leonardo Pedrosa Luna ("Luna") are African–American Muslims incarcerated at Ely State Prison ("ESP"). They bring this 42 U.S.C. § 1983 suit against E.K. McDaniels, the warden at ESP as *pro se* plaintiffs proceeding *in forma pauperis*.

The complaint was originally brought by Theus who alleged three claims for relief (# 3) for First, Eighth, and Fourteenth Amendment violations. Defendant McDaniels moves for dismissal and for summary judgment. (# 13) Theus has filed an opposition to the defendant's motions. (# 16) The

defendant has replied to this opposition. (# 21)[1]

## STATEMENT OF FACTS

"Ramadan" is the ninth month of the Islamic lunar calendar. It is a holy month throughout which Muslims must strictly fast from dawn to sunset. Before a Muslim can pray and break his daily fast during Ramadan, he must perform ablutions which require water.

The following facts are not in dispute:

On February 12 and 13, 1994, the first two days of the Ramadan fast, the plaintiffs and 12 other Phase I (high-security) Muslim inmates were allowed to use the chapel restroom for their ceremony. On the third day of the fast, February 14, 1994, the Muslims were performing or preparing to perform their ablutions in or near the chapel restroom. Lt. Rowell interrupted their service to inform them that the defendant had ordered the inmates not to use the restroom. The defendant had previously determined that inmates congregating by the restroom created a security risk and would not be allowed.

Upon being denied access to the restroom, ten of the Muslims decided to protest by refusing to leave the chapel. The other four of the Muslims left the chapel. The security staff threatened to use chemical gasses to break up the demonstration. One Muslim threw a chair through the chapel window. The remaining Muslims then surrendered to the security staff.

Upon surrendering, the security staff placed the prisoners in handcuffs and leg restraints, and made them lie face down on the floor. Soon after, defendant McDaniels arrived with associate warden Neven and a K–9 unit. The inmates were strip searched and placed in orange coveralls. The medical staff examined all the inmates and reported no injuries. The inmates were then placed in administrative segregation. The plaintiffs were taken off the Ramadan list and were not allowed to participate in the services for the rest of the month.

## ANALYSIS

### A. Standards of Review

Since the court has considered matters outside the pleadings, defendants' motion will be treated as one for summary judgment. A motion for summary judgment should be granted to a moving party as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the non-moving party, there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c); *Semegen v. Weidner,* 780 F.2d 727 (9th Cir. 1985). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141 (9th Cir.1983).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. First Amendment Claim

■ The plaintiffs allege that they were deprived their right to freely exercise their Islamic faith because of a prison policy. The policy of not allowing the Muslim inmates access to the chapel restroom allegedly denied them the opportunity to properly perform their Muslim ceremony.

■ Prisoners, despite their conviction and confinement, do not forfeit all of their constitutional rights. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Still, their constitutional rights are subject to substantial limitations and re-

---

**1.** An identical complaint filed by plaintiff Luna (*Luna v. Angelone,* CV–N–94–886–DWH), was consolidated by an order of the court on March 13, 1995. (# 24) *Theus v. Angelone,* CV–N–94–257–DWH, has been designated the base file.

**268**

strictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987).

■ The Supreme Court has held that "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The *Turner* court then articulated four factors relevant to determining the reasonableness of the regulation.

■ First, a valid, rational connection must exist between the prison regulation and the legitimate, neutral government interest justifying it. *Id.* This first factor is a *sine qua non* to the policy's validity. *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir.1990). The *Walker* court further explained the prison authorities burden in showing a valid rational connection:

> "[T]hey must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required at to each point."

*Id.* at 386.

The defendant has satisfied this burden. The penological interest involved is prison security. Specifically, when the prisoners congregate in or near the restroom they are difficult to observe. The affidavit of associate warden Neven shows that the actual basis for the policy is to better observe the inmates. Finally, denying the inmates access to the restroom is reasonably related to safeguarding against potential security problems.

The second *Turner* factor is whether there are alternative means of exercising the right that remain open to the inmates. 482 U.S. at 90, 107 S.Ct. at 2261. When other means of exercising the right remain available to the inmates, a "measure of judicial deference [is] owed to corrections officials ... in gauging the validity of the regulation." *Pell v. Pro-*

*cunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). The policy instituted by the prison staff did not prohibit the Muslims from taking part in Ramadan services. Rather, it only restricted their access to the chapel restroom during the service. The plaintiffs have not indicated how performing ablutions in their cells would not suffice for the purposes of their Ramadan services.

The third *Turner* factor is the impact that accommodating the constitutional right will have on other inmates or the prison staff. 482 U.S. at 90, 107 S.Ct. at 2261. Because the inmates are more difficult to observe when they congregate in or near the chapel restroom, security concerns are raised. This situation could potentially jeopardize the safety and security of both the inmates and the prison staff.

■ The fourth *Turner* factor is the existence or absence of alternatives to the regulation. *Id.* The existence of obvious, easy alternatives to the regulation may indicate unreasonableness. At the same time, the absence of alternatives may indicate reasonableness. *Id.* "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence" of the regulation's reasonableness. *Id.* at 91, 107 S.Ct. at 2262.

The only apparent alternative to requiring the inmates to perform their ablutions in their cells is to allow them to use the chapel restroom. As discussed above, this raises security concerns. The plaintiffs do not present another alternative to the regulation that accommodates their rights at a *de minimis* cost to valid penological interests.

The plaintiffs allege that the policy of denying the Muslim inmates access to the chapel restroom was not for legitimate penological interests, but instead was the result of intentional discrimination against the Muslims, because they were Muslims and predominantly African–American. In support of this allegation, the plaintiffs explain how all other religious groups at ESP are allowed access to the chapel restroom and that the Muslims are receiving discriminatory treatment from the prison staff. They also allege

that the defendant did not respond to plaintiff Theus' memo sent on February 13, 1994, explaining the Muslims' need to have access to the restroom for their ablutions and for the breaking of the fast. They allege that they were not informed to perform their ablutions before arriving at the chapel on the evening of February 14, 1994.

The plaintiffs' account of the events which took place after being restrained describes how the defendant shouted obscene insults at them, at their Islamic faith, snatched off their kufi (prayer caps), and threw their Qur'an (Muslim Holy Book) down the hallway. This alleged conduct by the defendant has not been contradicted.[2] However, even if proven, this evidence would not raise an issue of material fact. The plaintiffs have alleged no facts demonstrating that the policy was not reasonably related to a valid, neutral penological interest.

### C. Eighth Amendment Claim

The Eighth Amendment prohibits prison officials from inflicting cruel and unusual punishment upon prison inmates. *Whitley v. Albers*, 475 U.S. 312, 318–319, 106 S.Ct. 1078, 1083–1084, 89 L.Ed.2d 251 (1986). The key inquiry is not the nature of the inmate's injury, but the reason for inflicting that injury. *Parker v. Asher*, 701 F.Supp. 192 (D.Nev.1988). When use of excessive force is alleged, the standard is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the sole purpose of causing pain and suffering. *Whitley*, 475 U.S. 312, 321, 106 S.Ct. 1078, 1085. Relevant factors in determining whether force was applied in good faith include the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. *Id.* Factors of equal importance are the extent of the threat to the safety of staff and inmates, as reasonably perceived by the officers on the basis of facts then known, and efforts made to temper the severity of a forceful response. *Id.*

Applying these factors to the present case shows that the force used by the security staff was not excessive. Ten high security inmates participated in a protest which involved throwing a chair through the chapel window. There was a need for some reasonable use of force. After the inmates surrendered it was unclear whether they still posed a security threat. Placing the inmates in handcuffs and leg restraints was reasonable under the circumstances. The security staff did not physically abuse the inmates or use chemical agents which were available. The prison medical staff examined the inmates and found none injured. Conducting strip searches and placing the inmates in administrative segregation are standard procedures for these circumstances.

The plaintiffs have not set forth specific facts showing that the defendant acted maliciously or sadistically. There is no genuine issue for trial.

### D. Fourteenth Amendment Claim

The plaintiffs allege various deprivations of liberty and property which took place after the chapel incident on February 14, 1994. The plaintiffs had their cells stripped and were placed in administrative segregation. Once in administrative segregation it took two days to receive bedding and hygiene materials, and five days to receive personal, legal, and religious materials. The plaintiffs allege that some of their property was damaged or missing.

The plaintiffs do not allege that they were denied a post-deprivation hearing, or that the prison staff was deliberately indifferent to their conditions of confinement. Rather they allege Equal Protection violations in that they received disparate and unequal treatment because they were Muslims and African–Americans. To support this allegation,

---

**2.** While the defendant's conduct does not reach the level of a constitutional violation, it does suggest a lack of self-restraint and a general attitude of disrespect and intolerance. Clearly some sort of discipline was necessary under the circumstances. However, once the inmates were restrained, there was no need to verbally abuse the Muslims, or to show such flagrant disregard for their faith. A warden should set a positive example for the rest of the prison staff. On this occasion, defendant McDaniels did not do so.

they argue that the prison staff violated N.R.S. § 209.131 and Nevada Department of Prisons (NDOP) Institutional Policy 7.11.

However, the plaintiffs have not alleged any facts indicating that the punishment they received after the February 14, 1994 incident was disparate or unequal to what other similarly situated inmates would have received. Nor have they alleged any facts showing that the disciplinary measures taken were religiously or racially motivated. Furthermore, they have not alleged facts that constitute a violation of N.R.S. § 209.131 or NDOP Institutional Policy 7.11.

**IT IS HEREBY ORDERED** that the defendants' motion (# 13) for summary judgment is **GRANTED.** The Clerk shall enter judgment accordingly.