210 F.3d 961 (9th Cir. 2000)
 DARRELL KEITH RICH, aka DARRELL EDWARD YOUNG ELK, HENRY ADAMS, and LEONARD FORSTER,Plaintiffs-Appellants,
v.
Northern District of JEANNE WOODFORD, Acting California Warden of the California, San Francisco State Prison at San Quentin; CALIFORNIA DEPARTMENT OF DISSENTS FROM CORRECTIONS, C.A. ("CAL") DENIAL OF TERHUNE, Director of the REHEARING EN BANC California Department of Corrections,Defendants-Appellees.
 No. 00-99004
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Filed April 7, 2000
 
 COUNSEL: Clyde M. Blackmon, Hill C. Snellings, Karen L. Hamilton, Blackmon & Snellings, Sacramento, California; and James S. Thomson and Saor R. Stetler, Berkeley, California, for the plaintiffs-appellants.
 Bill Lockyer, Attorney General, and David P. Druliner, Paul D. Gifford, Morris Lenk, and Danette Valdez, Deputy Attorneys General, San Francisco and Sacramento, California, for the defendants-appellees.
 Dissent by Judge Reinhardt; Dissent by Judge Kozinski; Dissent by Judge Wardlaw
 Rehearing en banc denied.
 REINHARDT, Circuit Judge, with whom PREGERSON, KOZINSKI, and WARDLAW, Circuit Judges, join:
 Because I believe that neither the Constitution nor human decency permits us to deny a condemned man his last rites based on the implausible security concerns advanced by the state, I dissent from the refusal to rehear this case en banc.
 Shortly after midnight on March 15, 2000, officials from the California Department of Corrections (CDC) executed Darrell Keith Rich at San Quentin State Prison. On March 8th, Rich had filed an action under 42 U.S.C. S 1983 seeking to take part in a sweat lodge ceremony prior to his execution.[1] Rich, a Native Americanman, believed that by purifying his body, mind, and soul, this ceremony would allow him to make amends for the people he harmed on earth and would prepare him to cross over from this world to the next. It was the equivalent to him of other religions' last rites.
 On March 13th, the district court denied Rich's request. A panel of this court affirmed the denial the following day. A sua sponte call for an en banc vote was made, but a majority of the active judges voted to deny a hearing. The Supreme Court likewise refused to intervene. It is from our refusal to hear this religious liberty issue en banc that I now file this dissent.
 The sweat lodge ceremony is a central part of Native American religion. An authoritative treatise describes it as follows:
 This ceremony is nearly universal among American Indian tribes, from coast to coast and in Alaska, across Canada and Mexico today. A sweat bath is one of the main ways by which ritual purification is achieved. . . . The sweat lodge ceremony serves sev eral purposes. It is a religious rite to purify the body and a medical treatment to cure ailments or to pre vent ill health by influencing the spirits. . . . The sweat bath ceremony is such a central part of the religious beliefs and rites of tribes that it is incon ceivable that an Indian could practice his religious life in the traditional Indian way without having access to a sweat lodge. . . .
 Arlene B. Hirschfelder & Paulette Morin, The Encyclopedia of Native American Religions 287 (1992). See also Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir. 1995) (taking judicial notice of "the central and fundamental role played by the Sacred Sweat Lodge in many Native American religions"); Allen v. Toombs, 827 F.2d 563, 565 n. 5 (9th Cir. 1987) (describing sweat lodge ceremony at Oregon penitentiary). There is a sweat lodge located on the lower yard in the general population area at San Quentin, and it is regularly used by San Quentin's Native American inmates. Rich made a credible showing before the district court that he follows Native American religion and that sweat lodge purification is fundamental to his sincerely held beliefs.[2] Indeed, over the last ten years Rich repeatedly pursued administrative remedies at San Quentin Prison to record formally his religious identity and exercise his Native American beliefs. In its brief to this court, however, the state exhibited a bizarre attitude toward the subject of religion in general and Native Americans' beliefs in particular. The California Attorney General's office argued that the religious beliefs the condemned man adhered to were "incapable of either proof or refutation,"and "secular authorities, such as the prison Warden, cannot be required, on faith, to accept risks to prison security and the personal safety of others, in order to satisfy these kinds of belief" (emphasis added).[3] One wonders whether the Attorney General would make the "incapable of proof or refutation" argument regarding the last rites of major religions. After all, no religious beliefs of which I am aware are susceptible of objective proof or refutation. One also wonders, of course, what "these kinds of belief" implies with respect to the particular religious practices of Native Americans.
 The issue, in the end, was whether prison officials should have accommodated Rich's request to participate in a preexecution sweat lodge ceremony under the reasonableness test of Turner v. Safley, 482 U.S. 78 (1987), and O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). This test does not "obviate the need for accommodation. Reasonableness in this context refers not only to the relation between the goals of a regulation and its means, but also to the balance struck between the needs of the prison administrators and the constitutional rights of prisoners." Salaam v. Lockhart, 905 F.2d 1168, 1171 n.6 (8th Cir. 1990) (citing Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir. 1988)).[4]
 Officials at San Quentin denied Rich's request on the ground that, as a death row inmate, he was designated as "Maximum A" custody. A CDC regulation requires that all inmates with that custody level -the most restrictive form of long-term confinement at San Quentin -remain under direct and constant supervision and stay within the confines of their housing units. They may not participate in religious ceremonies that require removal from those units. The district court found there was a valid and rational connection between this regulation and the prison officials' interest in maintaining safety and security. See generally Allen v. Toombs, 827 F.2d at 567 (upholding policy excluding inmates in disciplinary segregation unit from participating in sweat lodge ceremony).
 This analysis, however, overlooks the extraordinary circumstances of this case and the transparent weakness of the state's purported concerns. Rich's request did not challenge the CDC regulation generally. Rather, he sought a one-time departure from the regulation, based on his impending execution, his specific spiritual beliefs regarding the need for predeath purification through a sweat lodge ceremony, and the availability of a functioning sweat lodge on the grounds of San Quentin State Prison. The officials' general security rationale for their treatment of "Maximum A" inmates did not provide a reasonablebasis for denying Rich's specific preexecution request.
 The prison officials complained that accommodation of Rich's request would require additional staff resources and heightened security measures to transport him to the sweat lodge. But such additional resources and precautions are always required in the days leading up to executions. Officials are constitutionally obligated to accommodate the condemned prisoner's fundamental religious needs at the same time they make the necessary preparations for his execution.
 In a declaration submitted to the district court, Acting Warden Jeanne Woodford maintained that for Rich to participate in the sweat lodge ceremony, officials would have to move him though the general prison population, where Rich would be "at risk of being attacked by unrestrained inmates" unless officials implemented the "extreme measure" of a general lockdown. Implicitly, the state professed grave concern that Rich would be killed before it could execute him. However, the state's protestations lack even the specter of credibility. It conceded at a hearing on March 13th that there would in any event be a lockdown at San Quentin on the following day -the day before Rich's execution. Officials could therefore have escorted Rich to the sweat lodge without any risk of interference by inmates in the general population. Indeed, a news wire reported on the evening of March 14th, not long after the panel voted to affirm the district court's decision, that state officials "said even if they do receive a last minute order to permit the ceremony, it would not delay Rich's execution because San Quentin could swiftly arrange the ritual at its on-site sweat lodge." Michael Kahn, Court Denies Calif. Killer's Sweat Lodge Appeal, Reuters News Service (Mar. 14, 2000).[5]
 The prison officials raised a host of additional security concerns regarding the sweat lodge ceremony itself. They argued that weapons could be concealed in the small and dark interior of the lodge. It is undisputed, however, that trained prison guards would have been able to conduct an exhaustive search of the sweat lodge area and strip search Rich and his spiritual advisors prior to the ceremony's commencement. The officials argued that the ceremony would require the removal of Rich's restraints, but Rich conceded that officials could keep him restrained throughout. Prison doctors, it should be noted, classified Rich as "permanently mobility impaired " due to severe arthritis and degenerative disc disease. He could barely walk and had to be transported to visits in a wheelchair. Since approximately 1980, officials at San Quentin have regularly supervised sweat lodge ceremonies for inmates not designated as "Maximum A" custody, apparently without incident. These ceremonies have involved dozens of inmate participants at a time. It is thus clear that San Quentin officials would have been able to maintain complete control over a pre-execution ceremony involving just Rich and his two spiritual advisors.
 The warden also argued that if she had allowed Rich to attend a sweat lodge ceremony, other inmates might have perceived this accommodation "as an act of favoritism" which "could lead to resentment." This argument approaches the absurd. I doubt that many inmates at San Quentin would have envied Rich the treatment he received at the hands of the state on March 15th, even if prison officials had allowed him to prepare for his death in a spiritually proper way.
 While courts should not casually substitute their judgment for that of prison administrators, "deference does not mean abdication." Walker v. Sumner, 917 F.2d 382,385 (9th Cir. 1990). The Turner standard is "not toothless," Thornburgh v. Abbott, 490 U.S. 401, 414 (1989), but rather requires courts to evaluate whether the security justifications proffered by prison officials are objectively reasonable. See, e.g., Walker, 917 F.2d at 386 ("Prison authorities cannot rely on general or conclusory assertions to support their policies."); Reed v. Faulkner, 842 F.2d at 963 (officials may not pile "conjecture upon conjecture" to justify infringement of constitutional rights). Here, the officials' attenuated and unsupported security justifications did not satisfy this test.
 The district court's application of Turner elevated ordinary and manageable security concerns over Rich's extraordinary need to exercise his fundamental religious beliefs before his execution. If the state is to perform the function of ending people's lives (which may or may not be a proper function for it to perform), the least it can do is to allow those it kills to comply with the tenets of their religion before it dispatches them to whatever follows. Certainly it should not deny them the right to engage in their most fundamental religious rites by asserting the argument that religious beliefs are "incapable of either proof or refutation." I dissent.
 
 
 Notes:
 
 
 [1]
 Rich brought his action under the First Amendment, Eighth Amendment, Fourteenth Amendment, and the International Covenant on Civil and Political Rights. I address here only Rich's First Amendment claim. It is worth noting, however, the American Indian Religious Freedom Act (AIRFA), which provides:
 On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.
 42 U.S.C. S 1996. The AIRFA is a statement of federal policy to protect Indians' exercise of their religion, but does not create a cause of action.
 
 
 [2]
 The prison officials submitted below a declaration from Dr. Richard L. Allen, a research and policy analyst for the Cherokee Nation, stating tha "[a]lthough the use of the sweat lodge or sweat house is a significant religious activity among many tribes, I can say with assurance that it has no religious significance to the Cherokee people." Several declarations submitted by Rich controverted Allen's assertion, however, and in any case Rich did not identify his beliefs with the Cherokee Nation specifically, but rather with a Native American religion that is "broader than the practices of specific tribes." The prison officials did not directly challenge the sincerity of Rich's religious belief, and courts generally do not "presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." Employment Division v. Smith, 494 U.S. 872, 887(1990).
 
 
 [3]
 The full statement of the Attorney General reads:
 Although Rich may sincerely believe, based on his faith, that the Sweat Lodge ceremony is necessary for his successful pass ing into the next world, in the nature of things this belief is inca pable of either proof or refutation. However, secular authorities, such as the prison Warden, cannot be required, on faith, to accept risks to prison security and the personal safety of others, in order to satisfy these kinds of belief.
 Opposition to Emergency Application for Order That Would Require Respondent to Provide a "Sweat Lodge" Ceremony for a Condemned Prison Inmate at 3 (Mar. 14, 2000).
 
 
 [4]
 It is true that San Quentin officials did allow Rich some alternative means of exercising his religious beliefs prior to his execution. The availability of alternative means of exercising a prisoner's religious beliefs is one of the factors to be considered under Turner and O'Lone. In this case, officials allowed Rich to participate in a sacred pipe ceremony inside the visiting room and gave him access to a medicine bag, eagle wing, and other sacred objects. These alternatives, however, were simply no substitute for the purification ritual that Rich requested, which, as observed earlier, was indispensable to Rich's Native American religious beliefs. See, e.g., Whitney v. Brown, 882 F.2d 1068, 1073-76 (6th Cir. 1989) (holding that denial of group religious study and service during "critical and very special time" of Passover effectively prevented Jewish inmates from "having meaningful religious services").
 
 
 [5]
 Contrast the statement of Deputy Attorney General Carlos Martinez, who, on his way to witness Rich's execution, told a newspaper reporter that by seeking a sweat lodge ceremony (in a complaint filed in the district court one week earlier) Rich was "just trying to delay the execution." Harriet Chang et al., Serial Killer Dies at San Quentin, San Francisco Chronicle, Mar. 15, 2000, at A1.
 
 
 KOZINSKI, Circuit Judge, with whom Judge WARDLAW joins, dissenting from the order denying rehearing en banc:
 Darrell Keith Rich was a very bad man. For the horrible crimes he unquestionably committed against innocent girls and women, mothers and daughters; for the suffering he caused them and their families; for the terror he inflicted on the people of Cottonwood, he amply deserved to die. But no man should be sent to his Maker without being allowed to take the spiritual steps he considers necessary to prepare for the event. A decent respect for the humanity of even the worst among us obligates us to accommodate such rituals where doing so will not impair serious governmental interests. This obligation is not diminished because the ritual does not involve a minister, a priest or a rabbi.
 As explained in Judge Reinhardt's dissent, the state made no credible showing that its interests would be impaired by allowing Rich and his spiritual advisors to participate in the sweat lodge ceremony. Indeed, the arguments contrived by the Attorney General to defeat Rich's request cast doubt on the professional candor of the lawyers who presented them.
 An imminent execution sorely tests the limits of professionalism among lawyers. Exaggerated arguments are, unfortunately, too common. While it is always troubling to see lawyers stretch the bounds of advocacy, it is far more so when it is done by lawyers for the state. As the Supreme Court noted many years ago, a prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds, Stirone v. United States, 361 U.S. 212 (1960).
 
 
 1
 WARDLAW, Circuit Judge, dissenting from the order denying rehearing en banc:
 
 
 2
 I join the dissents of Judges Reinhardt and Kozinski, but write separately to emphasize the concern expressed by both of my colleagues as to the State's representations to the Court. As Judge Reinhardt notes, after the panel issued its opinion, the press reported a statement by "state officials" that Rich's execution would not have been delayed in any case by a sweat lodge ceremony because San Quentin could "swiftly arrange" the ritual "on-site." Michael Kahn, Court Denies Calif. Killer's Sweat Lodge Appeal, Reuters English News Service (Mar. 14, 2000). This very issue was earlier raised in the district court, and the State's response can only becharacterized as evasive, at best, and disingenuous, at worst.
 
 
 3
 Rich's counsel had heard rumors that the State was preparing to proceed with the sweat lodge ceremony in a manner that would neither delay the scheduled execution nor pose a security risk. He noted his understanding that a sweat lodge was being prepared for 3 p.m. that day, and the court inquired as to the significance of that fact to its decision:
 
 
 4
 Mr. Thompson [Counsel for Rich]: [I]t's our understanding from talking to spiritual advisors that the sweat lodge is being prepared and will be ready for a sweat to occur today at 3 p.m. So the concerns with respect to whether or not it's a security problem or anything else, I think, perhaps fade if that, in fact, is occurred. [sic]
 
 
 5
 . . . .
 
 
 6
 The Court: So what's the significance of the fact that a sweat lodge is being set up and may be opera tive even today?
 
 
 7
 Mr. Thompson: It's being readied for the sweat lodge that Mr. Young Elk [Rich] would attend, is our understanding. It is prepared. It is ready to go. There is also word from the prison that we understand that there's a way in which there could be a temporary sweat lodge that can be built inside death row's yard area so that a sweat lodge could be created at that point as well.
 
 
 8
 The State failed to directly answer the questions Mr. Thompson raised about the sweat lodge, which, if answered in the affirmative, would have mitigated the State's concerns about safety and timeliness. The State's indirect response conveyed the impression that it did not have a secure, swift and reasonable means at hand for providing the ceremony. The State's attorney represented:
 
 
 9
 . . . Plaintiff's counsel has made several references to the fact that the sweat lodge is prepared and ready to go. I'm not sure what he's referring to, and there isn't any evidence in the record that that, in fact, has been done.
 
 
 10
 But what we can tell the court is on Saturday, a special sweat lodge ceremony was performed by the spiritual advisors on inmate Rich's behalf, and his family and prayers were -his family at that time. So that may very well be why the sweat lodge looks like it's ready, because it was, in fact, used on Satur day for a ceremony in inmate Rich's honor.
 
 
 11
 (emphasis added). The deputy attorney general's statement may have been literally correct, but if in fact a sweat lodge ceremony could have been readily performed without creating a security risk or a delay in execution, the district court and the court of appeals should have been informed. Surely, the State's representative should have known whether her Turner arguments were factually based before making them to the court.
 
 
 12
 Because of the accelerated process by which we must consider issues raised in impending executions, the state must be forthright and forthcoming about the feasibility of protecting the constitutional rights of a condemned inmate. We should be able to apply the "reasonableness" analysis required by Turner v. Safley, 482 U.S. 78 (1987), with confidence in the information we have been provided.
 
 
 13
 The State appropriately imposed the death penalty for the horrible crimes committed by Rich. But Rich did not raise any last-minute challenge to the propriety of his conviction or sentence; he simply requested his last rites in accordance with his religious beliefs. I therefore dissent.