James **YOUNGBEAR,** Robert Youngbear, and Robert Strongheart, Plaintiffs,

v.

John A. **THALACKER,** Ernie Owens, and David Costello, Defendants.

No. C 99–3027–MWB.

United States District Court, N.D. Iowa, Central Division.

Nov. 8, 2001.

Patrick Ingram, Mears Law Office, Iowa City, IA, for Plaintiffs.

Layne M. Lindebak, Asst. Iowa Atty. General, Des Moines, IA, for Defendants.

**MEMORANDUM OPINION REGARDING TRIAL ON THE MERITS**

BENNETT, Chief Judge.

TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ................................... 907

II. FINDINGS OF FACT ............................................. 908

III. LEGAL ANALYSIS ............................................. 912
 A. First Amendment Claim ..................................... 912
 1. Turner Analysis ...................................... 913
 2. First Turner factor .................................. 914
 3. Second Turner factor ................................. 915
 4. Third Turner factor .................................. 915
 5. Fourth Turner factor ................................. 915
 B. Equal Protection Claim .................................... 915
 C. Qualified Immunity ........................................ 916
 1. Scope and purpose of qualified immunity .............. 916
 2. The court's inquiry .................................. 918

IV. CONCLUSION ................................................. 920

The issue of the right of inmate practitioners of the Native American religion to have access to a sweat lodge has been the subject of widespread and pervasive litigation over the past decade. *See e.g., Rich v. Woodford,* 210 F.3d 961 (9th Cir.2000) (dissent from refusal to rehear case *en banc* in which a condemned man had sought to take part in a sweat lodge ceremony prior to his execution); *McElhaney v. Elo,* 202 F.3d 269, 2000 WL 32036, at *4 (6th Cir. 2000) (unpublished decision affirming the granting of summary judgment for defendant prison officials on First Amendment claim that plaintiff's free exercise of religion rights were denied by lack of access to a sweat lodge); *Swan v. Smith,* 129 F.3d 127, 1997 WL 697802 (9th Cir.1997) (unpublished opinion considering prisoner's claim that his constitutional rights

were violated when he and other close custody inmates were not allowed to attend sweat lodge ceremonies); *Thomas v. Gunter*, 103 F.3d 700, 702 (8th Cir.1997) (affirming the granting of summary judgment in favor of prison officials where district court determined that denial of extended daily access to sweat house was rationally related to legitimate penological interests); *Cubero v. Burton*, 96 F.3d 1450, 1996 WL 508624, at *1 (7th Cir.1996) (unpublished decision considering claims that prison officials interfered with inmates' First Amendment right to practice their Native American religion by denying them religious materials, permission to "smudge" in their rooms, and temporarily closing sweat lodge at prison); *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir.) (considering Native American inmate's claim that prison officials violated his First Amendment right to free exercise of religion by denying him access to sweat lodge), *cert. denied*, 519 U.S. 874, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996); *Werner v. McCotter*, 49 F.3d 1476, (10th Cir.) (holding that absence of evidence as to governmental interest and burden associated with provision of sweat lodge to facilitate exercise of Native American shamanism precluded summary judgment for prison officials), *cert denied sub nom. Thomas v. McCotter*, 515 U.S. 1166, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Thomas v. Gunter*, 32 F.3d 1258, 1261 (8th Cir.1994) (holding that prison officials would not be entitled to qualified immunity for violating prisoner's rights to free exercise of religion unless rational relationship could be shown between legitimate penological interests

and denial of access to prison sweat lodge for prayer); *McKinney v. Maynard*, 952 F.2d 350, 351 (10th Cir.1991) (inmate sought declaratory and injunctive relief to permit the construction of a sweat lodge at correctional facility), *overruled by McAlpine v. Thompson*, 187 F.3d 1213 (10th Cir.1999); *Allen v. Toombs*, 827 F.2d 563, 565 & nn. 5, 9 (9th Cir.1987) (upholding regulations denying access to the sweat lodge by high security inmates but allowing weekly access by general prison population).

In this case, the court must determine whether correctional officials' year-long delay in the construction of a sweat lodge, used for conducting ceremonies of the Native American religion, at a newly opened correctional facility, was violative of plaintiffs' right to free exercise of religion under the First Amendment and equal protection under the Fourteenth Amendment.

## I. INTRODUCTION AND BACKGROUND

On April 22, 1999, plaintiffs James Youngbear, Robert Youngbear, and Robert Strongheart filed their complaint in this lawsuit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, against defendants John A. Thalacker, Ernie Owens, and David Costello.[1] Plaintiffs, all Native Americans presently incarcerated at the Fort Dodge Correctional Facility ("FDCF"), Fort Dodge, Iowa, assert that defendants, all Iowa prison officials at FDCF, violated their First Amendment right to free exercise of religion by delaying construction of and access to a sweat lodge.[2] Plaintiffs also allege that defen-

---

1. There were seventeen plaintiffs originally named in the complaint: James Youngbear; Kenneth A. Frazier; Kenneth Morris; Robert Saul; Dayton Sabasta; Michael Wabasha; Ellsworth Youngbear; Christopher Chapman; Gary Rice; Robert Youngbear; Michael Benton; Terrance Keahna; Michael Cleveland;

Marvin Mitchell; Jeremy McKinney; and, Henry White. Of the original plaintiffs, only James Youngbear and Robert Youngbear remain. Plaintiff Strongheart joined the lawsuit on November 22, 2000.

2. Plaintiffs presented no evidence at trial with respect to defendant Costello. Therefore, the

dants violated their Equal Protection rights under the Fourteenth Amendment to the United States Constitution by providing members of other religions the opportunity to conduct services while denying the same opportunity to plaintiffs to conduct a Native American religious service. Defendants filed their answer in this matter on November 8, 1999. In their answer, defendants denied plaintiffs claims, and asserted the affirmative defense of qualified immunity.

This case was tried to the court on October 16, 2001, in Sioux City, Iowa. The court exercised jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs were represented by Patrick Ingram of Mears Law Office, Iowa City, Iowa. Defendants were represented by Assistant Attorney General Layne M. Lindebak, Des Moines, Iowa.

The court will begin with its findings of fact and then turn to its legal analysis and conclusions of law regarding plaintiffs' claims. If the court concludes that defendants are liable on any of the legal theories asserted by plaintiffs, it will determine whether defendants have established their affirmative defense of qualified immunity. Finally, if the court concludes that defendants are liable on any of the legal theories and not entitled to qualified immunity, the court will determine what remedies are available and appropriate under the circumstances.

## II. FINDINGS OF FACT

The Fort Dodge Correctional Facility ("FDCF"), Fort Dodge, Iowa, opened in April of 1998. FDCF is a medium level correctional facility. At the time FDCF opened, it did not have a sweat lodge. A sweat lodge is used by members of the Native American religion as the heart of their purification ceremony. A sweat lodge consists of an oval, dome shaped structure made using willow saplings as the frame. The sweat lodge structure was traditionally covered by animal hides but is now often covered by canvas. Inside the sweat lodge a pit is dug in which rocks are placed after being heated in a fire pit outside the structure. The Iowa Department of Corrections knew when the FDCF opened that it would require a sweat lodge. It could also have reasonably anticipated having Native American inmates incarcerated at that facility within thirty days of its opening.

Plaintiffs James Youngbear, Robert Youngbear, and Robert Strongheart are inmates at the FDCF. Robert Youngbear was transferred to the FDCF on June 24, 1998. Approximately a month later, on July 29, 1998, James Youngbear was transferred to the FDCF. Robert Strongheart arrived at the FDCF on December 16, 1998. Plaintiffs are all members of the Native American religion All three plaintiffs practiced the Native American religion before being incarcerated. Plaintiffs James Youngbear and Robert Youngbear had each been involved in the construction of sweat lodges before being incarcerated. All three plaintiffs hold sincere beliefs in the Native American religion.

Defendant John Thalacker is the FDCF's warden. Defendant Ernie Owens was hired in September 1998, as the first treatment manager for the FDCF. Before working at the FDCF, defendant Owens was a substance abuse counselor at the Clarinda correctional facility, Clarinda, Iowa. Defendant Owens's responsibilities as a treatment manager at the FDCF

court concludes that plaintiffs have failed to establish their claims with respect to defendant Costello and are not entitled to judgment on their claims with respect to defendant Cos-

tello. For the remaining portion of this decision any reference to "defendants" is to defendants Owens and Thalacker only.

included work programs, private sector jobs, and religious activities at the FDCF. Defendant Owens's duties at Clarinda did not involve supervision of the Native American religious activities at that correctional facility. There were five to ten Native American inmates at the FDCF when Owens arrived there.

On September 9, 1998, inmate Kenneth Frazier submitted a written request for services in the Native American religion at the FDCF to Marry Dix, the treatment director at the FDCF.[3] At the time of Frazier's request, defendant Owens was in his orientation process. Owen met with Frazier on October 5, 1998, and discussed Frazier's request. Frazier also requested that until a sweat lodge could be constructed at the FDCF that the Native American inmates be permitted to meet for one hour each week. Owen stressed to Frazier the need for the FDCF to have a consultant to advise the institution on how to start and maintain Native American religious services. Owens wanted the assistance of a Native American consultant because he did not have a background in Native American affairs. Frazier informed Owens that he had built sweat lodges previously. Frazier initially told Owens that any ground on which the sweat lodge would be situated would need to be blessed by a medicine man. Frazier informed told Owens that

while such a blessing would be preferred, it was not required.

The Iowa Department of Corrections has contracted with Native American religion consultants since the mid–1980's to supervise and assist Native American inmates who practice the Native American religion who are incarcerated in Iowa's correctional facilities.[4] The Native American religion consultants also advise correctional staffs as to religious practices and beliefs. The Native American religion consultants' duties include quarterly visits to each correctional institution assigned to them, supplying ceremonial items, informing correctional staff as to which inmates may participate in the sweats, and conducting the sweats when at the institution.

Prior to June of 1998, the Iowa Department of Corrections contracted with Ralph Preston to act as its Native American religion consultant. However, by June 8, 1998, the Iowa Department of Corrections decided not to renew its contract with Preston because Preston was not making his required visits to the correctional facilities. The Iowa Department of Corrections decided to contract with two Native American consultants, one to work with correctional facilities located in western Iowa and the other to work with correctional facilities located in eastern Iowa. The Iowa Department of Corrections contracted with

---

3. Frazier's request is Defendants' Exhibit H. In his request, Frazier wrote in relevant part:

 This is a request for our Native American church time. I'm asking for a weekday time maybe Tuesday or Monday I know we don't have a sweat lodge yet, but this time that us Native Americans are asking for will help us prepare for when it gets here. I'm enrolled in Santee Nebraska I am a Pipe carrier for the people. I'm also a Sundance pledger. I've lived with a Medicine Man before I have been taught this Red Road since I was seven.
 712–258–2726 Home
 279–6754 Work

 I'm sure our consultant Fred LaMere will be willing to work with us & the staff to get a sweat lodge here soon as possible. I would like to teach this class & run the sweat lodg (sic) ceremoneys (sic). I just came from Newton & was running it there. Is there some way I can talk to you our (sic) the chaplon (sic) to get this started. For now we will *only* need an hour a week. When the sweat lodg (sic) does get here we will need more time. Frazier letter, Defendants' Ex. H.

4. The Iowa Department of Corrections also contracts with consultants for such other religions as Christianity, Judaism, and Islam.

Fred LaMere to be a Native American consultant to provide services to the correctional facilities located in eastern Iowa: the Iowa State Penitentiary in Fort Madison, Iowa: the Anamosa State Penitentiary in Anamosa, Iowa; the Mount Pleasant Correctional Facility; and, the Newton Correctional Facility. LaMere resides in Sioux City, Iowa, located in Northwest Iowa.[5] The reason LaMere was assigned to the correctional facilities located in eastern Iowa was because the Iowa Department of Corrections was most concerned about the Iowa State Penitentiary and the Anamosa State Penitentiary.

Paul A. Muller, the Iowa Department of Corrections's Assistant Deputy Director for the Eastern Region was in charge of locating a Native American religion consultant to replace Preston. On June 4, 1998, Muller called Maria Pearson to find a Native American consultant. Pearson, a Native American who lives in Ames, Iowa, and is on the Governor's Committee For Native American Affairs, said that she would look into finding a consultant. On June 23, Muller again called Maria Pearson regarding finding a Native American consultant. Pearson indicated that she thought she new an individual in Des Moines, Iowa, who might be interested in the position. Muller had used Pearson in this capacity previously to find Native American religion consultants for the Iowa Department of Corrections. On June 29, 1998, Muller tried to call Pearson regarding the consultant position but her telephone was temporarily disconnected. On July 2, 1998, Muller again tried to get in contact with Pearson by telephone. On this occasion Pearson was not home. Muller left a message on Pearson's answering machine inquiring whether the person from

Des Moines, that Pearson had previously mentioned, was interested in the Native American religion consultant position. On July 10, 1998, Muller again telephoned Pearson and found that she was not home. Muller left his name on her answering machine. On July 13, 1998, Muller learned from Jane Ross that Maria Person had called and said that the person in Des Moines she had previously mentioned was not interested in the Native American religion consultant position. On September 13, 1998, LaMere telephoned Muller regarding the FDCF. LaMere informed him that willows could be brought into the FDCF and that the inmates could construct a sweat lodge in that facility. LaMere also suggested the name of an individual, Elmer Running, to Muller who might be interested in the Native American religion consultant position. Muller did not request that LaMere go to the FDCF to oversee the construction of a sweat lodge there and LaMere did not volunteer to do so.

Muller subsequently met with Running, Running's wife, and LaMere sometime in the fall of 1998, regarding the Native American religion consultant position. In December of 1998, the Iowa Department of Corrections contracted with Elmer Running, a Nebraska medicine man, to become the Iowa Department of Corrections's Native American religion consultant for the Iowa correctional facilities located in western Iowa. Running was expected to visit the FDCF soon to provide guidance and help establish the sweat lodge at the FDCF. When Running did not visit the FDCF, defendant Owens telephoned the Running residence and spoke with his wife. Mrs. Running indicated that they did not have enough money to enable Run-

---

5. The court takes judicial notice of the fact that Sioux City is 92 miles from Fort Dodge, Iowa.

ning to come the FDCF at that time. On February 26, 1999, the contract between Running and the Iowa Department of Corrections was terminated because Running was unable to fulfill its terms.

Muller then set out to find another Native American religion consultant. On March 8, 1999, Muller again telephoned Maria Pearson to find a Native American religion consultant. Muller subsequently interviewed a person for the consultant position. After interviewing this person, Muller contacted Pearson to find out whether she would recommend that person for the position of Native American religion consultant. Pearson told Muller that she would not recommend this individual for the position.

Frazier requested that Native American inmates at the FDCF be permitted to meet periodically. This request was granted in January of 1999. Native American inmates were permitted to meet for one hour in the prison chapel. Although Frazier requested that Native American inmates be permitted to smudge at these meetings, this request was denied due to state regulations prohibiting open fires in buildings.[6]

Because it was unclear how long it would take to contract with another Native American consultant, the chaplain at the Newton Correctional Facility, Perry Stevens, was contacted to assist the FDCF in establishing a sweat lodge at the FDCF. Stevens was contacted because he had experience with Native American practices at the Newton Correctional Facility. Owens delegated to Ryan Charles Moore the responsibility to check with other correc-

tional institutions regarding their policies with respect to the practice of Native American religion and to write a proposed policy for the FDCF concerning the practice of Native American religion at that facility. Owen wanted to be able to construct the sweat lodge as soon as the weather permitted in the spring. Moore obtained copies of Native American religious policies used at other Iowa correctional facilities and researched smudging. Moore spoke with Stevens and inmate Frazier regarding what materials would be needed for the sweat lodge and to conduct a sweat. Moore also contacted the Iowa Department of Natural Resources to make arrangements for obtaining the willow saplings needed for construction of the sweat lodge.

Stevens came to the FDCF on April 13, 1999, to make recommendations for establishing a sweat lodge at the FDCF. Stevens viewed the proposed cite for the sweat lodge and recommended moving the site east in order to permit the FDCF's Master Control to monitor the fire pit. After Stevens's visit to the FDCF, Moore prepared a memorandum to Owens detailing Stevens suggestions and the supplies that needed to be purchased in preparation for conducting a sweat at the FDCF.

On April 19, 1999, Pearson called Muller and told him that Alex Walker would be a good choice for the position of Native American religion consultant. After speaking with Pearson, Muller called Walker on April 19, 1999, and offered him the position of Native American religion consultant. Walker accepted the offer. On April 26, 1999, Muller mailed a contract

---

6. Smudging is a purification process prior to prayer in which the individual burns small amounts of sage, sweet grass or pure tobacco to produce smoke. *See* Defs.' Ex. 1, Hand-BOOK OF RELIGIOUS BELIEFS AND PRACTICES, STATE OF WASHINGTON DEP'T OF CORRECTIONS 6 (1995).

"The individual desiring to smudge lights the mixture, lets it smolder, then draws the smoke toward the heart and over the head to receive its blessing. After the smudging takes place, the smoke is offered to the four directions, Mother Earth, and Father Sky." *Id.*

for the position of Native American religion consultant to Walker, and on April 29, 1999, Walker signed the contract.

Moore cut willow saplings himself from an area designated by the Iowa Department of Natural Resources. Moore's obtaining of the willow saplings, however, was delayed because the willows were located close to a river and spring weather conditions made the area inaccessible. A sweat lodge was built at the FDCF by Native American inmates without a consultant or medicine man being present. Construction of the sweat lodge took approximately three hours. On June 5, 1999, the first sweat was held at the FDCF's sweat lodge.

After obtaining copies of Native American religion policies used at other Iowa correctional facilities, Moore spent approximately 30 hours reviewing those policies and drafting a policy for the FDCF concerning Native American religion. On July 22, 1999, the policy drafted by Moore concerning Native American religion was approved. Defendant Thalacker was responsible for assuring that a sweat lodge was built in a timely fashion at the FDCF.

### III. LEGAL ANALYSIS

#### A. First Amendment Claim

■■■ Plaintiffs contend that defendants unreasonably delayed responding to their requests for the construction of a sweat lodge and that they be permitted to conduct sweats. Prisoners do not lose all rights to free exercise of religion upon incarceration. *See Shabazz*, 482 U.S. at 348, 107 S.Ct. 2400; *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (*per curiam* ); *Kikumura v. Hurley*, 242 F.3d 950, 956 (10th Cir.2001); *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir.), *petition for cert. filed*, 70 U.S.L.W. 3162 (Aug. 23, 2001) (No. 01–324); *Makin v. Colorado Dep't of Correc-*

*tions*, 183 F.3d 1205, 1209 (10th Cir.1999); *Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir.1991); *Friend v. Kolodzieczak*, 923 F.2d 126, 127 (9th Cir.1991); *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989); *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir.1985). The rights retained include the right to congregate for prayer or discussion. *See O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400. Nonetheless, a prisoner's free exercise right "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400; *see Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir.1999) (noting that "prison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate penological interests."); *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir.1993) (holding that the right to free exercise of religion is "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals, or to maintain prison security."); *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir.1987) (per curiam) (noting that a prisoner's "free exercise right ... is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.").

■■■ Prison regulations that infringe on the constitutional rights of prisoners to free exercise of religion are judged by their reasonableness and prison officials are not required to choose the least restrictive means possible in furthering administrative interests. *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991) ("Prison regulations that infringe on the constitutional

rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests."); *see also Garza v. Carlson,* 877 F.2d 14, 16 (8th Cir.1989) (affirming district court's interpretation of *O'Lone,* as stating that no constitutional violation is committed where prison officials have shown a legitimate penological basis for limiting an inmate's access to communal worship); *Butler–Bey v. Frey,* 811 F.2d 449, 451 (8th Cir.1987) (prison officials need only show that the religious practice "could create a potential threat to a legitimate penological interest" and that their response was not exaggerated); *Murphy v. Missouri Dept. of Corrections,* 814 F.2d 1252, 1256 (8th Cir.1987) (need for a particular prison regulation limiting free exercise of religion is to be balanced against the invasion of religious freedom the restriction entails). The reasonableness of defendants' actions are determined pursuant to the factors articulated in *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Cf. O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

### 1. Turner Analysis

The court must consider four factors to determine if regulation of exercise of religion is reasonable. *Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350–51, 107 S.Ct. 2400, 96 L.Ed.2d 282. In *Turner,* the United States Supreme Court considered whether Missouri prison regulations restricting inmate correspondence and marriages were constitutionally permissible. *Turner,* 482 U.S. at 91–93, 107 S.Ct. 2254. The Court upheld the restrictions on correspondence, noting the rational relationship between the restrictions and prison security, but struck down the restrictions on inmates' rights to marry.

*Id.* at 96, 107 S.Ct. 2254. The reasonableness test announced in *Turner* by the court balances an inmate's free exercise right and the prison's legitimate correctional goals and security concerns. The *Turner* reasonableness test sets forth four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *accord O'Lone,* 482 U.S. at 350, 107 S.Ct. 2400. Second, a reviewing court must assess whether there are "alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *accord O'Lone,* 482 U.S. at 351, 107 S.Ct. 2400. Third, a court must determine "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *accord O'Lone,* 482 U.S. at 352, 107 S.Ct. 2400. Finally, "the absence of ready alternatives" to the prison regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254.

However, only sincerely held religious beliefs require accommodation by prison officials. *See Malik v. Brown,* 16 F.3d 330, 333 (9th Cir.1994), *supplemented,* 65 F.3d 148 (9th Cir.1995); *Mosier v. Maynard,* 937 F.2d 1521, 1526 (10th Cir. 1991). Thus, before the *Turner* factors are applied to plaintiffs' free exercise claim, they must first establish the existence of a sincerely held religious belief, and that the challenged regulation or conduct infringes upon that belief. *See Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th

Cir.1990); *Hill v. Blackwell*, 774 F.2d 338, 342–43 (8th Cir.1985); *accord Malik*, 16 F.3d at 333; *Callahan v. Woods*, 658 F.2d 679 (9th Cir.1981). The determination of whether an individual is sincere in his or her beliefs is a factual one. *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir.1991) (citing *Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829, 832–33, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989)). Here, there is nothing in the record which challenges the sincerity of plaintiffs' belief in the Native American religion. The only evidence in the record on the issue is each plaintiff's respective testimony. The court concludes that each plaintiff is sincere in his beliefs in the Native American religion. The court further finds that the absence of a sweat lodge at the FDCF prevented inmates at that institution who are members of the Native American religion from practicing significant rituals of that religion so as to infringe upon that belief. Therefore, the court will analyze the *Turner* factors with respect to plaintiffs' free exercise claim.

### 2. First Turner factor

■ In considering the first *Turner* factor, the court must inquire whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. In this case, a prison regulation is not at issue but an administrative decision: defendants decision to wait for a Native American religion consultant to be hired before proceeding to construct the sweat lodge. Defendants assert that this decision allows Native American inmates to exercise their religion as fully as practicable within a prison setting while also providing correctional officials with guidance from a knowledgeable source as to what inmate requests are legitimately related to the Native American religion. Defendants

contend that they did not know how a sweat lodge should be constructed and were concerned that if they attempted to construct a sweat lodge without guidance that the sweat lodge constructed would prove inadequate or unacceptable. The flaw in this assertion is that it ignores the fact that the Iowa Department of Corrections had a Native American religion consultant, Frank LaMere, under contract at all relevant times. LaMere called Muller on September 14, 1998, only five days after Frazier had submitted his first request for services in the Native American religion at the FDCF. LaMere told Muller that willows could be brought into the FDCF and the inmates at the FDCF could assemble the sweat lodge themselves. Ironically, Frazier suggested in his letter of September 9, 1998, that LaMere be contacted to assist them in the construction of a sweat lodge at the FDCF. While the court acknowledges that LaMere was not under contract for the FDCF, neither Muller nor any of the defendants ever requested that LaMere come to the FDCF on a temporary basis to aide in the construction of a sweat lodge at that facility.

Moreover, even if LaMere had been unwilling to provide guidance at the FDCF, defendants had available to them Iowa Department of Corrections staff from other facilities who were knowledgeable in the Native American religion. Indeed, when a replacement for Running was not readily found, Moore consulted with Newton Correctional Facility's chaplain, Perry Stevens. Stevens was contacted because he had experience with Native American practices at the Newton Correctional Facility. Stevens came to the FDCF on April 13, 1999, and made recommendations for establishing a sweat lodge at the FDCF. Thus, the court finds that the first *Turner* factor weighs in favor of plaintiffs.

### 3. Second Turner factor

Examining the second *Turner* factor, the court concludes that there were no alternatives available to plaintiffs in the exercise of their religion due to the actions of defendants. While Native American inmates were allowed to meet in the chapel once a week and possess certain sacred objects of the Native American religion, such as medicine bags, eagle feathers, and tobacco ties, the possession of such sacred objects could not substitute for the absence of a sweat lodge and the lack of a facility for performing a central tenet of the Native American religion, the purification ceremony. Moreover, even though Native Americans were permitted to meet once a week, they were not permitted to smudge. Thus, the court concludes that the second *Turner* factor weighs in favor of plaintiffs.

### 4. Third Turner factor

The third *Turner* factor requires the court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. Here, the court finds that accommodation of plaintiffs would have had a negligible impact on guards and other inmates. Defendants were always willing to construct a sweat lodge at the FDCF. Defendants had at their disposal the resources necessary for construction of the sweat lodge and the creation of those rules and regulations necessary for its use. Accommodating plaintiffs merely required that the construction of the sweat lodge and the creation of prison rules and regulations occur at an earlier date. Indeed, plaintiffs conceded in their testimony that the sweat lodge could have been constructed earlier if it had been a higher priority item. Therefore, the court concludes that the third *Turner* factor also weighs in favor of plaintiffs.

### 5. Fourth Turner factor

Finally, the fourth *Turner* factor requires the court to consider that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91, 107 S.Ct. 2254. Here, as noted above, defendants could have accommodated plaintiffs rights by either requesting that its Native American religion consultant LaMere provide temporary assistance to get the sweat lodge up and running at the FDCF, or by seeking Iowa Department of Corrections personnel from other correctional facilities, such as Perry Stevens, who were knowledgeable in the tenets of the Native American religion come to the FDCF and assist in the construction of the sweat lodge there. Thus, the court concludes that the fourth *Turner* factor also weighs in favor of plaintiffs.

Looking at the totality of all four *Turner* factors, the court concludes that plaintiffs have proved that defendants' actions in delaying the construction of a sweat lodge at the FDCF were not reasonably related to valid penological interests. Therefore, the court concludes that plaintiffs have established that defendants' action violated the Free Exercise Clause of the First Amendment of the United States Constitution.

### B. Equal Protection Claim

Plaintiffs also contend that the actions delineated above demonstrate that defendants treated them, as members of the Native American religion, less favorably that other inmates at the FDCF, in violation of the Equal Protection Clause.

Under the Equal Protection Clause, in order to prevail, plaintiffs must show that a defendant acted with discriminatory purpose. *See McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 390–92, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Tyler v. Hot Springs School Dist. No. 6*, 827 F.2d 1227, 1230 (8th Cir.1987). While plaintiffs need not prove that a discriminatory intent was the sole motivating factor, the plaintiff must show that a discriminatory purpose was a motivating factor. *Village of Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555. As the Supreme Court has observed: " 'Discriminatory purpose' ... implies more than an intent as volition or intent as awareness of consequences.... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group ." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). There can be no "negligent" violations of an individual's right to equal protection. Rather, only deliberate discrimination violates the equal protection clause. *See McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756; *Village of Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555; *Davis*, 426 U.S. at 240, 96 S.Ct. 2040; *United States v. Clary*, 34 F.3d 709, 713 (8th Cir.1994), *cert. denied*, 513 U.S. 1182, 115 S.Ct. 1172, 130 L.Ed.2d 1126 (1995); *Tyler*, 827 F.2d at 1230.

■ Here, the court finds that plaintiffs' have failed to meet their burden of demonstrating purposeful religious discrimination on the part of defendants.

There is no evidence from which the court may infer that defendants' asserted reasons for delaying the construction of a sweat lodge at the FDCF were a pretext for discrimination. It is clear that defendants wished to wait until a consultant was hired by the Iowa Department of Corrections to advise them on conducting various aspects of the Native American religion at the FDCF. The Iowa Department of Corrections sought input from a respected member of the Native American community, Maria Pearson, into who should be hired as a consultant. The fact that two of the Native American religion consultants did not perform as expected and that the hiring of the third took a prolonged amount of time was the result of mischance and not the product of discriminatory intent. Therefore, the court finds that plaintiffs have failed to prove their claim that defendants' violated the Equal Protection Clause.

### C. Qualified Immunity

#### 1. Scope and purpose of qualified immunity

■ The standard for qualified immunity is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *accord Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir.2001); *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir.2001); *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir.2001); *Vaughn v. Ruoff*, 253 F.3d 1124, 1127 (8th Cir.2001); *Thomas v. Talley*, 251 F.3d 743, 746 (8th Cir.2001); *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir.2001); *Sexton v. Martin*,

210 F.3d 905, 909 (8th Cir.2000); *Samuels v. Meriwether,* 94 F.3d 1163, 1166 (8th Cir.1996); *Bills v. Dahm,* 32 F.3d 333, 334 (8th Cir.1994); *Sellers ex rel. Sellers v. Baer,* 28 F.3d 895, 898 (8th Cir.1994), *cert. denied,* 513 U.S. 1084, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995); *Latimore v. Widseth,* 7 F.3d 709, 712 (8th Cir.1993) (*en banc*) (quoting *Jackson v. Rapps,* 947 F.2d 332, 338 (8th Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)), *cert. denied,* 510 U.S. 1140 (1994); *Givens v. Jones,* 900 F.2d 1229, 1231–32 (8th Cir.1990) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). "What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotations omitted); *Phillips v. Collings,* 256 F.3d 843, 849 (8th Cir.2001) (quoting *Wilson,* 526 U.S. at 614, 119 S.Ct. 1692); *Tlamka,* 244 F.3d at 632 (same). "For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.'" *Phillips,* 256 F.3d at 849 (quoting *Buckley v. Rogerson,* 133 F.3d 1125, 1128 (8th Cir. 1998)) (in turn quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *accord Burnham v. Ianni,* 98 F.3d 1007, 1017 (8th Cir.1996); *Brayman v. United States,* 96 F.3d 1061, 1064 (8th Cir .1996); *Good v. Olk–Long,* 71 F.3d 314, 315 (8th Cir. 1995); *Prosser v. Ross,* 70 F.3d 1005, 1007 (8th Cir.1995); *Bills,* 32 F.3d at 335; *Latimore,* 7 F.3d at 712; *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989).

"To defeat a government official's claim of qualified immunity, a plaintiff must demonstrate that the official's actions violated a statutory or constitutional right, that the right was clearly established at the time of the violation, and that a reasonable official would have known that his conduct violated that right." *Technical Ordnance, Inc. v. United States,* 244 F.3d 641, 648 (8th Cir.2001) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727); *accord Sexton v. Martin,* 210 F.3d 905, 909–910 (8th Cir.2000); *see Bills,* 32 F.3d at 334–35 (noting that the shield of qualified immunity is breached if "the unlawfulness of the action [is] apparent in light of pre-existing law."). However, the Supreme Court has made clear that a plaintiff cannot defeat an official's claim of qualified immunity " 'simply by alleging violation of extremely abstract rights.' " *Bills,* 32 F.3d at 335 (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034); *Givens,* 900 F.2d at 1232 (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging a violation of extremely abstract rights." *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034; *Latimore,* 7 F.3d at 712. Case law dealing with qualified immunity reflects a conflict of competing interests. *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727; *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034; *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Government officials must not be limited in their actions by fear of monetary damages and liability. *Harlow,* 457 U.S. at 807, 102 S.Ct. 2727; *Pierson,* 386 U.S. at 554, 87 S.Ct. 1213; *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). There are also concerns for imposing upon public officials the expense of defending insubstantial claims. *Harlow,*

457 U.S. at 808, 102 S.Ct. 2727; *Butz,* 438 U.S. at 507–08, 98 S.Ct. 2894. The social costs of continually defending public work include a subsequent diversion from future programs and the deterrence of qualified individuals from entering positions of public office. *Harlow,* 457 U.S. at 814, 102 S.Ct. 2727. On the other hand, "[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034 (quoting *Harlow,* 457 U.S. at 814, 102 S.Ct. 2727). Qualified immunity attempts to strike a balance between these concerns, providing " 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *accord Bagby v. Brondhaver,* 98 F.3d 1096, 1098 (8th Cir. 1996); *Ludwig v. Anderson,* 54 F.3d 465, 470 (8th Cir.1995). The qualified immunity defense should fail if the official violates a clearly established right, because "a reasonably competent public official should know the law governing his conduct." *Slone,* 983 F.2d at 109 (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727). It extends, however, to "a prison official who relies on a facially valid regulation unless he knows or should know that the regulation violates a well established constitutional right consisting of the particular act" he punishes or prohibits. *Wolfel v. Morris,* 972 F.2d 712, 719–20 (6th Cir. 1992).

 Qualified immunity is not just a defense, but an immunity to suit for money damages. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Qualified immunity is a question of law which is usually determined by the court prior to trial. *Swenson v. Trickey,* 995 F.2d 132, 135 (8th Cir.), *cert. denied,* 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 468 (1993) (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Qualified immunity must be asserted by the defendant, or the privilege is lost. *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806. A denial of qualified immunity is immediately appealable. *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996); *Mitchell,* 472 U.S. at 526–27, 105 S.Ct. 2806; *Bagby v. Brondhaver,* 98 F.3d at 1098; *Allison v. Department of Corrections,* 94 F.3d 494, 496 (8th Cir.1996); *Reece v. Groose,* 60 F.3d 487, 489 (8th Cir.1995).

### 2. *The court's inquiry*

 In determining an official's entitlement to immunity, the courts undertake a two-pronged analysis. *Carroll,* 262 F.3d at 849; *Tlamka,* 244 F.3d at 632; *Weiler v. Purkett,* 137 F.3d 1047, 1050 (8th Cir. 1998); *Manzano v. South Dakota Dep't of Soc. Serve.,* 60 F.3d 505, 509 (8th Cir.1995). First, the court must determine if a deprivation of a constitutional right has been alleged. *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692; *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *Carroll,* 262 F.3d at 849; *McGee v. Broz,* 251 F.3d 750, 752 (8th Cir.2001); *Tlamka,* 244 F.3d at 632; *Weiler,* 137 F.3d at 1050; *George v. City of St. Louis,* 26 F.3d 55, 57 (8th Cir.1994); *Manzano,* 60 F.3d at 509. If so, the court " 'must determine whether that right was clearly established at the time of the alleged violation.'" *Carroll,* 262 F.3d at 849 (quoting *Manzano,* 60 F.3d at 509); *Weiler,* 137 F.3d at 1050;

The conduct of a reasonable official is measured by what " '[a] reasonably competent official should know.' " *Walters v. Grossheim*, 990 F.2d 381, 384 (8th Cir.1993) (quoting *Slone v. Herman*, 983 F.2d 107, 111 (8th Cir.1993), and denying qualified immunity because a reasonably competent official should know that unless a judgment has been stayed it must be obeyed); *accord Bagby*, 98 F.3d at 1098. Good faith is not an element of the defense, nor relevant to the qualified immunity inquiry, because "the standard is one of 'objective reasonableness.' " *Slone*, 983 F.2d at 110 (quoting *Burk v. Beene*, 948 F.2d 489, 494 (8th Cir.1991), in turn quoting *Malley v. Briggs*, 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The Seventh Circuit Court of Appeals has held further that:

[The test of qualified immunity] is not whether the conduct is clearly constitutional, but whether it is clearly unconstitutional. [Plaintiff's] proposed test would focus on whether courts have specifically sanctioned particular conduct, whereas the correct inquiry is whether courts have found the conduct unconstitutional or have defined a constitutional right in such a way that " 'a reasonable official would understand that what he is doing violates that right.' " *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992) (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).... Application of this test "does not require a prior case that is 'precisely on all fours on the facts and law.' " *McDonald*, 966 F.2d at 293.... Rather, we

are concerned with whether the law was clear "in relation to the specific facts confronting the public official[s] when [they] acted." *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *see also McDonald*, 966 F.2d at 294.

*Knox v. McGinnis*, 998 F.2d 1405, 1409–10 (7th Cir.1993) (some internal citations omitted); *accord Anderson*, 483 U.S. at 640, 107 S.Ct. 3034 (it is not necessary that the exact action has been held previously unlawful, but the unlawfulness must be apparent and known from pre-existing law); *Latimore*, 7 F.3d at 712–13 (same). "To be clearly established, there need not be a case decided on all fours with the present factual circumstances." *Wilson*, 260 F.3d at 951; *accord Vaughn*, 253 F.3d at 1130. Instead, "it need only be apparent from pre-existing law that the conduct is unlawful." *Wilson*, 260 F.3d at 951 (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034).

Finally, the defense of qualified immunity may be utilized successfully

even in the face of a clearly established (and violated) constitutional right, if the defendant can demonstrate "the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 (citations omitted) (quoting *Harlow*, 457 U.S. at 819, 818, 102 S.Ct. at 2739, 2738).

*Latimore*, 7 F.3d at 712.

The determinative issue presented here is whether a reasonable corrections official would have known as of September of 1998 and thereafter that it violated the Free Exercise Clause to delay for twelve months providing a sweat lodge to Native American inmates who are practicing members of the Native American religion

because of problems with consultants the Iowa Department of Corrections contracted with to provide direction regarding the Native American religion. The court concludes that the contours of the right that plaintiffs assert was not defined sufficiently by prior case law such that a reasonable official would understand that what was done in the present case violated the Free Exercise Clause. As of September of 1998, there was a paucity of case law on the question of the speed by which state officials were required to respond to legitimate requests for a sweat lodge. Indeed, the decisions of the federal courts, as of September of 1998, do not provide a definitive answer or indicate even a trend in the law. Thus, the court finds that the contours of the right were not clear and specific enough that "a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. Thus, the court concludes that the second part of the qualified immunity test has been satisfied in this case and that defendants are entitled to qualified immunity here for all of plaintiffs' claims alleging violations of the Free Exercise Clause.

## IV. CONCLUSION

Initially, the court concludes that plaintiffs have failed to establish their claims with respect to defendant Costello and are not entitled to judgment on any of their claims with respect to defendant Costello. The court further concludes, having considered the totality of all four *Turner* factors, that plaintiffs have proved that defendants Owens and Thalacker's actions in delaying the construction of a sweat lodge at the FDCF were not reasonably related to valid penological interests. Therefore, the court concludes that plaintiffs have established that defendants Owens and Thalacker's actions violated the Free Ex-

ercise Clause of the First Amendment of the United States Constitution. The court also concludes that plaintiffs' have failed to meet their burden of demonstrating purposeful religious discrimination on the part of defendants. Therefore, the court finds that plaintiffs have failed to prove their claim that defendants Owens and Thalacker violated the Equal Protection Clause by their actions. Finally, the court finds that, as of September 1998, the contours of the right that plaintiffs assert were not defined sufficiently by prior case law such that a reasonable official would understand that what was done in the present case violated the Free Exercise Clause. Thus, the court concludes that the second part of the qualified immunity test has been satisfied in this case and finds that defendants Owens and Thalacker are entitled to qualified immunity here for all of plaintiffs' claims alleging violations of the Free Exercise Clause.

**IT IS SO ORDERED.**